UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                               Case No. 21 CR 0005 (BHL)

JOHN D. WHELAN,

    Defendants.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION FOR RETURN OF PROPERTY

### I.     BACKGROUND

The United States of America, by and through its attorneys, Richard G. Frohling, United States Attorney, and Julie F. Stewart and Kevin C. Knight, Assistant United States Attorneys, hereby submits the following response to the defendant's Motion for Return of Property. (ECF No. 47).

Defendant has been indicted on 13 criminal charges stemming from a drug dealing enterprise he ran on Saturdays from the basement of his co-defendant's residence in Fond Du Lac. Defendant is a psychiatrist who appears to have operated a legitimate psychiatric counseling practice, Monday thru Friday, at Affiliated Counseling in Beaver Dam, WI. (ECF No. 4). On Saturdays, however, Defendant issued prescriptions in exchange for cash from the basement of Tina Montezon's residence. During that Saturday drug-dealing, Defendant did not practice as a doctor. He was a drug dealer with a prescription pad. He performed no physical or mental-health examinations and conducted no drug tests. Indeed, Defendant failed to perform even the most basic medical assessments prior to prescribing controlled substances, often in large doses or dangerous combinations. Sometimes Defendant did not even see the patients to whom he issued prescriptions for these drugs. In exchange for signing his name on prescriptions of controlled substances

requested by his customers, Defendant and his co-defendant received between $200 and $300 in cash.

During the investigation, law enforcement spoke to several of Defendant's customers. Those individuals indicated that they "were prescribed controlled substances without a physical or mental exam, without submitting to a drug screening test, and without providing previous medical records." Exhibit A. The interviewees also said that Defendant asked minimal medical questions and prescribed specific substances based upon the customer's request. *Id.* Pharmacists also told agents that they observed Defendant's suspicious prescribing practices and, as a result, stopped filling Defendant's prescriptions. *Id.*

Defendant's drug dealing was also captured on video.[1] In fact, on three separate occasions, an undercover officer visited Montezon's residence on a Saturday. On each occasion the visit was recorded via video. It showed that the "medical practice" operated from the living room and basement of Montezon's house. The dining room was the "reception desk." It was staffed by Montezon and various other individuals (often Montezon's family members) who collected cash and checked in "patients." The video showed Montezon asking customers what drugs they wanted, and giving them advice on how to get the specific, requested drugs based on a variety of government and insurance regulations (rather than based on medical need or advisability). It also depicted how Montezon, a non-prescriber with a nursing degree, made prescribing decisions and how Defendant issued prescriptions without engaging in any medical decision-making or medical practice whatsoever. In the video, Defendant failed to establish any existing substance abuse issues, failed to do any physical or mental examination, and failed to even make eye contact with the "patients."

---

[1] The expert report of Dr. Chambers, produced by the United States in this case, provides the most readily accessible summary of these recorded undercover visits. It also demonstrates why Defendant's prescribing constituted drug dealing rather than medical practice. As such, the United States has attached that report to this motion, under seal, as Exhibit B, in an effort to provide the Court with an adequate background of the factual circumstances of this case.

Defendant profited significantly from this Saturday drug-dealing. Indeed, the United States traced $310,867.50 flowing from that drug-dealing enterprise to Defendant between January 2018 and June 2020. Nearly all of that money ($298,098.00) came in the form of cash. The remaining $12,770 consisted of checks written by Defendant's customers. The $310,867.50 Defendant earned from his Saturday drug-dealing was more than the $304,104.23 he earned from his legitimate psychiatry practice at Affiliated Counseling during the same time period. Thus, Defendant doubled his earnings by engaging in the unlawful distribution of controlled substances. Defendant used that money to purchase vehicles, pay-off his mortgage, and pay for his living expenses.

Based on this evidence, Magistrate Judge Dries granted seizure warrants for various accounts held by Defendant, which Defendant used to deposit the proceeds of his unlawful drug dealing. Judge Dries also authorized seizure of the vehicles Defendant and his co-conspirators used to travel to their drug house, and for which Defendant paid with proceeds of drug dealing. Pursuant to those warrants, and a seizure of cash from Defendant's person, the United States seized a total of $132,338.42. That amount represents less than half of what Defendant earned from the crimes for which he was subsequently charged.

On January 5, 2021, the Grand Jury indicted Defendant with one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846, one count of maintaining a drug-involved premises in violation of 21 U.S.C. § 856, ten counts of unlawful distribution of controlled substances in violation of 21 U.S.C. § 841, and one count of making a false statement to an Agency of the United States in violation of 18 U.S.C. § 1001. The indictment shows that the Grand Jury concluded there was probable cause to indict Defendant for drug dealing.

The facts of this case undercut Defendant's instant claim that the subject funds were improperly seized because they were proceeds of Defendant's provision of medical services to "patients" rather than proceeds of unlawful activity. (ECF No. 47, at pp. 2, 4-5). Indeed, the facts

make plain that the United States' seizures were appropriate and that Defendant is incorrect when he asserts that the United States simply assumed that all of Defendant's money was proceeds of unlawful activity. The United States disagrees with the characterization of the seized funds as "untainted" and contends that the monies seized are proceeds of drug dealing and properly forfeitable.

But this Court need not reach that issue because Defendant's motion is plagued by an even more fundamental error. His motion fails because it does not properly address the predicate question required of any motion to release seized funds: whether Defendant can show that he has no other source of funds to pay for counsel in this case. Without satisfying that initial inquiry, which Defendant has not done, no hearing is warranted and no funds need be returned.

## II. Legal Standard

The United States and the public have a real interest in preserving the availability of forfeitable property and obtaining the fullest possible measure of forfeiture in a case. The Supreme Court has long recognized that "[f]orfeitures help to ensure that crime does not pay: They at once punish wrongdoing, deter future illegality, and 'lessen the economic power' of criminal enterprises." *Kaley v. United States*, 571 U.S. 320, 323 (2014) (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 630 (1989)). Accordingly, as the Supreme Court has long recognized, "there is a strong governmental interest in obtaining full recovery of all forfeitable assets." *Caplin & Drysdale*, 491 U.S. at 631.

Where a defendant seeks the return of seized funds to pay for counsel of choice, the issue becomes a constitutional one that involves the defendant's Sixth Amendment right to counsel of choice. *See United States v. Moya-Gomez*, 860 F.2d 706, 724-25 (7th Cir. 1988).

To merit a hearing on this issue, however, the defendant must first show irreparable harm by demonstrating a bona-fide need for the seized assets in order to pay attorney's fees; in other

4

words, he must establish that he does not have alternative funds, or access to alternative funds, sufficient to hire a lawyer of his choice. *United States v. Kirschenbaum*, 156 F.3d 784, 792 (7th Cir. 1998) (A defendant must "show a bona fide need to utilize assets subject to the restraining order to conduct his defense" in order to be entitled to a hearing); *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998) ("Due process does not automatically require a hearing and a defendant may not simply as for one. As a preliminary matter, a defendant must demonstrate to the court's satisfaction that she has no assets, other than those restrained with which to retain private counsel"); *United States v. Wetselaar*, No. 11-CR-347-KJD, 2013 WL 8206582, at *19-20 (D. Nev. Dec. 31, 2013) (applying test where assets are seized through use of a warrant and finding that defendants "failed to make the preliminary showing required to demonstrate that they are unable to retain their counsel of choice without the unseized assets or that some of the seized assets are unrelated to the charges").

A bona fide need to utilize assets subject to forfeiture in order to conduct his defense must be established through a detailed financial affidavit provided by defendant. *United States v. Kielar*, 791 F.3d 733, 739-40 (7th Cir. 2015) (defendant's one-and-a-half page affidavit without documentary support was insufficient to show that he lacked other funds with which to retain counsel). The affidavit must specifically list defendant's income and assets; state what it is going to cost for the defendant to pay for counsel of his choice; and show how releasing the portion of the seized funds would enable defendant to afford counsel of his choice. *United States v. Bonventre*, 720 F.3d 126, 133 (2d Cir. 2013) (to qualify for a hearing, the defendant must disclose his net worth, provide a comprehensive list of his assets, and explain how he has been paying his living expenses; it is not enough to contrast his income stream and bank account balances with his living expenses and legal fees). The Court must then find that the defendant does not have other assets, or access to other assets, from which payment can be made. *Moya–Gomez*, 860 F.2d at 730.

The Seventh Circuit has held that once a defendant meets this burden, it then becomes the United States' burden to establish that there was probable cause to seize the assets given their nexus to the underlying offense. *Moya–Gomez*, 860 F.2d at 730 ("If the district court finds that the defendant does not have other assets from which such payments can be made, it then must require the government to demonstrate the basis for its assertion, contained in the indictment, that the assets are subject to forfeiture.").

The Court may hold an adversary hearing to "require the government to demonstrate the basis for its assertion, contained in the indictment, that the assets are subject to forfeiture." *Id*. The hearing may also investigate the defendant's assertion that he does not have other assets with which to pay counsel. *See United States v. Jamieson*, 189 F. Supp. 2d 754, 757 (N.D. Ohio 2002) (Government has right to rebut showing of lack of funds if hearing is granted), aff'd, 427 F.3d 394 (6th Cir. 2005).

Here, however, such a hearing is not necessary because Defendant cannot truthfully assert that he has no other assets with which to pay his attorneys, and the United States is able to establish that it had probable cause to seize the funds subject to forfeiture.

### III. Defendant is not Entitled to Release of Any Portion of the Seized Funds.

Defendant filed his motion for the release of funds without satisfying a critical and established prerequisite. In the motion, Defendant seeks the release of funds without first establishing a bona fide need for the funds at issue through a detailed financial affidavit. In fact, Defendant did not provide *any* financial affidavit. Instead, Defendant simply asserts that with a yearly income of $82,735.75, he is "destitute" and unable to afford counsel. (ECF No. 47 at *4-5, 7-8). It is worth noting that Defendant is a 76-year old single man with no dependents. And $82,735.75 is nearly $20,000 more than the median household income of $67,521.[2] As argued

---

2 https://www.census.gov/library/publications/2021/demo/p60-273.html

6

Case 2:21-cr-00005-BHL    Filed 04/26/22    Page 6 of 12    Document 48

below, it is unlikely that Defendant will be unable to establish any need for the seized funds because it is evident that he has alternative resources to pay counsel of his choice. But at this point he has not even tried to do so and that, itself, ends the inquiry.

Moreover, in addition to failing to provide the requisite affidavit, Defendant also makes the mistaken representation that this is simply a matter of certain funds allegedly being untainted and therefore subject to release. The United States disagrees. The funds at issue are all considered tainted property and were properly seized. A judicial officer has already made that probable cause finding when Magistrate Judge Dries approved the seizure warrant. The signed seizure warrant and accompanying affidavit established probable cause to find the balance of the funds contained in the identified bank accounts constituted property generated by drug dealing. The Grand Jury Indictment that followed similarly found probable cause for the forfeiture of a significant portion of the seized funds given their nexus to the alleged criminal activity. Accordingly, the entire amount of the seized funds are properly considered tainted property.

   A. *Defendant has not made a sufficient showing of lack of funds to pay counsel.*

As an initial matter, Defendant must first make a substantial showing of a lack of funds with which to hire counsel. In order to make this showing, a defendant must make a detailed disclosure of his financial condition. *Kirschenbaum*, 156 F.3d at 792 (defendant must demonstrate a "bona fide need" for the restrained funds to obtain counsel of choice by doing more than submitting "a bare-bones affidavit asserting that he personally lack[s] sufficient funds to obtain counsel of his choice."); *see also Bonventre*, 720 F.3d at 133 (finding that defendant "failed to satisfy the first threshold requirement because he provided insufficient information for a court to evaluate the extent of his unrestrained funds."). A conclusory statement that lacks document support is insufficient. *Kielar*, 791 F.3d at 739-40; *United States v. Emor*, 794 F. Supp.2d 143, 150 (D.D.C. 2011) (a bare-bones statement that defendant has only $50,000 in cash on hand, multiple

dependents, and no income is insufficient; nor can defendant wait until the probable cause hearing is commenced to satisfy the requirement; it is a threshold showing that must be made before the hearing).

Here, Defendant's motion fails procedurally because Defendant simply makes a conclusory claim that he is without funds to hire private counsel. He does not provide the necessary affidavit outlining his financial need for those specific funds. And he does not submit an affidavit explaining how much he owes, or will owe, in attorney's fees. The motion, instead, seeks the release of over $130,000, without establishing that the specific dollar amount is necessary and is the only source of funds from which to pay counsel. Indeed, Defendant does not tie his request to any need to pay any specific amount for reasonable attorney fees. It is, therefore, pure speculation that Defendant will need the amount requested in the motion. *See Moya-Gomez*, 860 F.2d at 730 (addressing when it is appropriate to order the release of funds in an amount necessary to pay reasonable attorney's fees). That is not consistent with the relevant precedent.

Defendant does not explain why he does not even attempt to make the requisite showing, but the implication is that he does not believe he needs to do so under *United States v. Luis*, 136 S. Ct. 1083, 1096 (2016). *Luis* is inapplicable here for the reasons stated in more detail below. But even if it did apply, it would not negate Defendant's *initial* burden to demonstrate a bona fide need for the funds. *See e.g.*, *United States v. $89,866.18*, No. 16-CV-42-JEM, 2021 WL 1560813, *2 (N.D. Ind. April 21, 2021); *see also United States v. Jones*, 844 F.3d 636, 640, 641 n.1 (7th Cir. 2016) (reasserting the threshold showings for release of funds and noting that "*Luis* says nothing about timing or burden shifting" and since "[the defendant] has not shown a bona fide need for the restrained assets," the failure to hold a hearing was not error).

Indeed, multiple courts that have addressed the question have "not interpreted *Luis* to mean that a defendant need no longer show a bona fide need for the funds." *Id.* (citing cases); *United*

8

*States v. Paronuzzi*, No. 17-CR-111, 2018 WL 1938463, at *2 (E.D. Va. Apr. 24, 2018) ("Defendant has cited no passage in *Luis* demonstrating that the threshold showings necessary under *Farmer* are no longer required, nor has she cited any other authority subsequent to *Luis* showing that the threshold showings have been abolished. Indeed, as the Government points out, courts post–*Luis* have continued to require the type of threshold showings articulated in *Farmer* before granting a post-seizure probable cause hearing.") (citing *United States v. Farmer*, 274 F.3d 800, 803-04 (4th Cir. 2001)) (listing cases); *United States v. Stokes*, No. 14-CR-290, 2017 WL 5986231, at *5 (N.D. Ga. Oct. 23, 2017), report and recommendation adopted, No. 14-CR-290-1-TWT, 2017 WL 5971986 (N.D. Ga. Dec. 1, 2017) ("*Luis* ... does not change the general rule that to be entitled to a hearing to determine whether seized assets are tainted, the defendant must make a prima facie showing of substantial financial need for those assets."); *United States v. Hernandez-Gonzalez*, No. 16-20669-CR, 2017 WL 2954676, at *4 (S.D. Fla. June 26, 2017), report and recommendation adopted, No. 16-20669-CR, 2017 WL 3446815 (S.D. Fla. Aug. 10, 2017) ("To the extent the Defendant relies on *Luis* for the proposition that the Government is mandated to return any frozen assets because of the Sixth Amendment's right to counsel, Defendant's argument misses the mark. There is nothing in *Luis* that imposes that type of per se requirement.").

Not only does Defendant's failure to establish a bona fide need for the release of funds require denial of his request, but it is also indicative of the fact that Defendant is unlikely to meet his burden. Indeed, Defendant's statements in his motion and his prior representations during the bond study make clear that he likely does have access to other funds with which to pay his attorneys.

As an initial matter, Defendant's "fixed income" is significant. He makes more than the median income by almost $20,000. That puts him in the top half of earners in the United States.[3]

---

3 https://www.statista.com/statistics/203183/percentage-distribution-of-household-income-in-the-us/

Moreover, some of that money comes from dividends, which means that Defendant owns stock or some other income-producing asset, which can be sold to pay for legal fees. Additionally, despite Defendant's assertion that he needs his income to "support family," the fact is that Defendant is a single individual with only adult children. (ECF No. 4). At least one of those children is his stepdaughter who was involved in Defendant's drug-dealing enterprise. Moreover, when Defendant provided information for his bond study, he claimed that he had a monthly income of only $4,023, which would equate to $48,276. That is less than 60% of what he claims he is making in the instant motion. Even with that under-reporting, he told the probation office that he had a positive monthly cash flow of $2,000. Additionally, Defendant told probation that he was renting a residence in Fond Du Lac. *Id.* But he also owns a residence in Green Bay (which is also, at least partly, the subject of the instant motion). All of these facts call into question whether Defendant can truly meet the burden of showing that he has no way to pay for his attorneys other than with the seized funds, particularly given that he has not even provided the Court with information regarding how much he owes his attorneys in the first place.

Finally, Defendant asserts that he has a "desire to sell his Green Bay residence to pay for representation and living expenses" but that he "is prohibited from doing so as the Government has placed a lien on this property." (ECF No. 47). Defendant's assertion is false. Although the United States listed the Green Bay property in the forfeiture notice of the indictment, the United States has not filed a lien against it. The United States has filed a *lis pendens*, but that does not prevent Defendant from selling the home. *See, e.g.*, *United States v. Balsiger*, 910 F.3d 942, 950-951 (7th Cir. 2018) (addressing a situation in which defendant sold his home despite a *lis pendens* and denying defendant's suggestion that the *lis pendens* presented a barrier to sale). Defendant has neither explained how the *lis pendens* has prevented him from selling the home nor sought the removal of the *lis pendens*. His assertions about the home, are, therefore, a moot point except to

the extent that they further demonstrate the ways in which Defendant has failed to make the appropriate predicate showing to justify a hearing, and subsequently, a return of funds.

    B. *The funds at issue are not untainted and* Luis *is inapplicable.*

The Court need not and should not reach the question of whether the funds were appropriately seized because Defendant has not met the predicate burden here. So for the purposes of the instant motion, the United States will simply note that the funds at issue here are not "untainted." They were properly seized pursuant to probable cause findings by Magistrate Judge Dries, buttressed by the Grand Jury in the indictment. For this additional reason, *United States v. Luis* does not help the Defendant here. Indeed, in *Luis*, the United States conceded that the funds at issue were untainted. And *Luis* did not arise in a forfeiture context. Moreover, in holding that Ms. Luis had a Sixth Amendment right to use her untainted assets to hire counsel of her choice, the Court sharply contrasted untainted assets with proceeds of crime that would be subject to criminal forfeiture. Thus, *Luis* can be fairly read to apply only to those non-tainted funds needed to hire counsel and not more. *See Balsiger*, 910 F.3d at 951. The United States contends that the funds at issue here are tainted, which makes Defendant's reliance on *Luis* misplaced even if that issue were ripe, which it is not given Defendant's failure to clear the established first hurdle of demonstrated need.

**IV. CONCLUSION**

For the aforementioned reasons, the United States respectfully requests that the Defendant's motion be denied. To the extent Defendant believes he can make the requisite showing, with sufficient specificity, of his bona fide need for funds to pay counsel and the lack of any alternative assets with which to do so, Defendant should file the appropriate motion with a supporting affidavit. Until he does so, and the Court determines that Defendant has met his predicate burden, no hearing or return of funds is appropriate.

11

Dated at Milwaukee, Wisconsin, this 26th day of April, 2022.

        Respectfully submitted,

        RICHARD G. FROHLING
        United States Attorney

By:   /s/ *Julie F. Stewart*

        JULIE F. STEWART
        KEVIN C. KNIGHT
        Assistant United States Attorneys